Filed 1/5/22  James v. Leavitt Group Agency of San Diego CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THOMAS JAMES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> LEAVITT GROUP AGENCY OF SAN DIEGO, INC. et al., <br><br> Defendants and Appellants. | D077353 <br><br><br> (Super. Ct. No. 37-2015-00021531-CU-WT-CTL) |


APPEAL from a judgment and orders of the Superior Court of San Diego County, Judith F. Hayes and Kenneth J. Medel, Judges.  Affirmed.

Silverstein & Huston, Steven A. Silverstein, Mark W. Huston and Robert I. Cohen for Defendants and Appellants.

John J. Freni for Plaintiff and Respondent.


INTRODUCTION

Thomas James, the president and minority shareholder of a local insurance agency, was terminated pursuant to a written employment agreement providing he would not be terminated except for good cause.  He later discovered the agency's corporate parent, Leavitt Group Enterprises,

Inc. (LGE), had negotiated to sell his shares of stock to his replacement at a higher price than it had previously offered him. He sued the agency, Leavitt Group Agency of San Diego (the Agency), and LGE (together, Defendants) for breach of the employment agreement and intentional interference with the employment agreement. He also asserted claims for breach of fiduciary duty, reformation of contract, and declaratory relief, based on events relating to transactions in which LGE had unfairly reduced his ownership interest in the Agency.

In the first phase of a bifurcated trial, the jury found in favor of James on his breach of contract cause of action against the Agency and in favor of LGE on the intentional interference with contract claim. The equitable claims were then tried in a bench trial before Judge Judith F. Hayes. Judge Hayes issued a tentative statement of decision in favor of James. However, after Defendants filed objections to the tentative statement of decision, and before they were ruled on by Judge Hayes, the case was reassigned to a different judge, apparently because Judge Hayes retired. Ultimately, the case was assigned to Judge Kenneth J. Medel.

Defendants filed a motion for partial new trial in which they argued Judge Hayes's unavailability to rule on their objections and finalize the statement of decision mandated a new bench trial. Judge Medel denied this motion, reasoning that the procedural error was harmless because the tentative statement of decision fully articulated Judge Hayes's reasoning and gave a complete and adequate basis for appellate review. Judge Medel then entered judgment based on the tentative statement of decision. After judgment was entered, Defendants filed another motion for new trial as well as a motion for judgment notwithstanding the verdict (JNOV). Judge Medel denied these motions as well.

On appeal, Defendants claim the jury trial was marred by instructional error. We conclude the trial court erred by giving a "good cause" instruction intended for termination decisions made pursuant to implied employment agreements. However, we also conclude the instructional error was not prejudicial. Defendants also challenge Judge Medel's orders denying their motion for a new bench trial, and again argue that Judge Hayes's failure to complete the statement of decision process is a procedural error that entitles them to a retrial of equitable issues. We conclude that because this irregularity only necessitates a new trial where it causes prejudice, and Defendants failed to establish prejudice, Judge Medel did not err by denying the motion. Finally, Defendants contend that certain findings in the tentative statement of decision are conflicting or unsupported by substantial evidence. We reject these challenges as well. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Factual Summary*[1]

LGE is a privately-owned insurance brokerage firm based in Cedar City, Utah. It owns insurance agencies throughout the United States and is

---

[1] Our factual summary is derived from evidence presented during the jury trial. Defendants' notice of designation designated a number of trial exhibits for inclusion in the clerk's transcript. However, the clerk's transcript filed with this court on August 31, 2020, did not include trial exhibits. On June 2, 2021, James lodged three volumes of trial exhibits with this court. Defendants were notified that their designated trial exhibits were not included in the clerk's transcript and they elected not to transmit additional trial exhibits given the lodgment of trial exhibits by James. Pursuant to California Rules of Court, rule 8.224(d), we then requested the parties to transmit additional trial exhibits, which were filed on October 12, 13, and 25, 2021.

3

the parent company of each of these agencies, providing them with operational services and support. LGE's executive chairman and CEO is Eric Leavitt.

LGE has a "unique organizational structure" under which it is the majority shareholder of individual agencies, and the individuals who run the agencies day-to-day are minority shareholders, whom LGE refers to as "co-owners." LGE "vest[s] a lot of autonomy" in those who "run the office day to day" and "seek[s] to bring them resources that . . . an agency of comparable size without the support wouldn't have."

Leavitt participated in each agency's decision-making as a member of its board of directors, but he usually did not communicate with co-owners directly. Rather, Leavitt would have discussions with LGE employees called "agency partner[s]," who served as intermediaries who communicated directly with agency co-owners. Chris Utterback, an LGE employee, was one of the agency partners who interfaced with co-owners and reported back to Leavitt. Utterback described himself as a "consultant" who "help[ed] with things that the local co-owners needed help with."

LGE made its first investment in the San Diego insurance market in 2006 or 2007, when it acquired the Agency, originally named Muria & Frick and later renamed Leavitt Group Agency of San Diego, Inc.[2] At the time of this acquisition, the Agency was a "subpar" agency with "a bad reputation in the San Diego community both for just general representation and performance." By 2009, the Agency was losing money. LGE grew dissatisfied with its management and started looking for a replacement.

---

[2]    In their response to the original complaint, Defendants represented that the Agency's full name is "Leavitt Group Agency of San Diego Inc., d.b.a. Leavitt Insurance Agency of San Diego." (Capitalization omitted.)

At the time, James was the head of the property and casualty division of the San Diego office of a large global insurance brokerage. Someone from LGE reached out to James and asked if he would be interested in taking over as head of the Agency. James flew to Cedar City to meet with Leavitt, who offered James the position of president of the Agency. James knew "it was a struggling place" and "didn't think there would be much left over after we cleaned it up going from a small market to a middle market"—that is, from small accounts to large commercial accounts that generated higher commissions—and that "it was going to be a long row to hoe . . . to get it turned around." However, James accepted the offer because it was a chance to "get [his] son established" in the insurance business, and because he "was 56 at the time and . . . felt like [he] had one more challenge left in [him]."

James started working at the Agency in November 2009. LGE wanted James to enter a written employment agreement, but he declined to sign it because it would have required him to "sign [his] book of business over" and he was still unsure about the Agency's prospects.

After he started working at the Agency, James spent his first several months "get[ting his] arms wrapped" around its business by interviewing staff and employees, reviewing its contracts, and transferring over his own book of business. He also "started immediately trying to attract former employees." During this initial period, James identified a number of problems in the Agency's operations. It had compensation arrangements that overcompensated some of its sales personnel, or "producers." It had $700,000 in debt to LGE and was borrowing money to make payroll. It had an expensive lease in a part of town not known for insurance agencies. Key insurance carriers were on the brink of ceasing to do business with the Agency.

James testified that to address these problems, he recruited his previous marketing director who had "great company relationships" and who was able to convince the key insurance carriers to remain. He cut costs by convincing some producers to "trigger their deferred compensation plan[s]." He sat down with other producers and "laid out expectations" for closing discrepancies between their salaries and the amounts they were generating. He instituted Monday morning sales meetings. He was not able to break the lease immediately, but when the lease term ended, he moved the Agency to a more appropriate neighborhood under a less expensive lease. After three producers with large books of business left the Agency, James recruited two others who partly made up the loss. James testified he found it challenging to attract middle-market producers to the Agency because it lacked name recognition and business expertise.

A.    *The Kahle Incident*

In 2011, the Agency suffered a major setback when a recent hire, Kristen Kahle, was caught embezzling. Kahle was an employee benefits producer who sold health insurance to businesses. She was introduced to LGE by a headhunter and was hired by the Agency in May 2010 after interviewing with James and Kevin Callister, an LGE agency partner.

After she started, Kahle began working with LGE's "restaurant group," a cross-agency group that sold insurance to restaurant franchisees. Utterback was the restaurant group's leader. Kahle "started developing a benefit program to go in sync with the restaurant program." She claimed to be setting up policies through a trust. James's area of expertise was property and casualty insurance, and Kahle's arrangement was unfamiliar to him, so he asked Utterback to review it. Utterback traveled to San Diego and met with Kahle, and afterward told James, "everything's good."

Initially, Kahle seemed to have "phenomenal" success. Although James received monthly production reports, they did not show anything was amiss. Then, in November 2011, LGE auditors performed a regularly scheduled audit of the Agency and discovered a $100,000 cash shortfall. The discrepancy was attributed to Kahle. A group that included Utterback and LGE accountants traveled to San Diego and met with Kahle. Kahle "very nicely" and "very convincingly" explained to this group how she had structured her policies using a third-party administrator. In February 2012, Utterback reported to Leavitt: "We had to sort through a sticky situation with [Kahle] and the restaurant trust. All has been sorted out [and] she's in compliance." As it turned out, she was not.

In March 2012, billing for Kahle's accounts was transferred to LGE's accounting center in Cedar City. The cash shortfalls continued. When LGE tried to investigate, Kahle became uncooperative and "belligerent." LGE ultimately learned, despite Kahle's lack of cooperation, that the purported third-party administrator was actually a company formed by Kahle (its name was "Creative Administrators, Inc."), and Kahle had been embezzling deposits intended to pay client premiums.

On May 18, 2012, LGE reported Kahle's apparent crimes to the California State Department of Insurance. Kahle was terminated, and the Agency filed a lawsuit against her. Kahle's theft and the legal fees cost the Agency roughly a million dollars.

James testified at trial that until he filed the instant wrongful termination lawsuit, no one at LGE had told him he was to blame for failing to discover Kahle's misconduct. Utterback, however, testified he became dissatisfied with James's performance as a result of the Kahle incident. He was critical of James's "detachment" and "lack of understanding" of how "the

7

moneys worked" in relation to Kahle's program. Leavitt testified he felt James was "certainly not culpable of the fraud" but was negligent in overseeing Kahle.

B. *The Employment Agreement*

In July 2012, more than two and a half years after he began working for the Agency, LGE and James entered into a written employment agreement (the Employment Agreement) with an effective date of November 12, 2009.

Section 2.03 of the Employment Agreement, "<u>Duties</u>," stated that James's "precise duties . . . may be altered from time to time by the Board of Directors of Agency to include those duties that are commensurate with being the President of a corporation," and that "the parties anticipate [James's] duties will include, but not be limited to, the following: [¶] (1) Producing new insurance accounts for the Agency; [¶] (2) Servicing insurance accounts for the Agency; [¶] (3) Developing business for the Agency by establishing, maintaining, and/or managing relationships with carriers; [¶] (4) Supervising and managing the Agency's employees and staff; and [¶] (5) Performing other tasks which enhance the Agency's profitability."

The Employment Agreement provided for termination by death, disability, detrimental cause, or good cause. Section 5.04, "<u>Termination for Good Cause</u>," stated, in relevant part, "The Agency may terminate Employee's employment for Good Cause . . . at any time upon forty-five (45) days advance notice to Employee." It further provided that " 'Good Cause' is defined as: (1) Employee's gross dereliction of duties; or (2) Employee's

8

persistent refusal to follow the instructions of Agency's President or Chief Executive Officer, or its Board of Directors."[3]

C.    *The Shareholders' Agreement*

Also in July 2012, James entered into a written agreement titled, "Close Corporation Stock Subscription and Shareholders' Agreement" (the Shareholders' Agreement) that made him a minority shareholder in the Agency.  Under the Shareholders' Agreement, James was granted sufficient shares to make him a 25 percent owner of the Agency; LGE held the remaining 75 percent of the shares.  The Shareholders' Agreement gave LGE the option to purchase James's stock if he was terminated for cause.

Utterback did not object to James becoming a shareholder or receiving a written employment agreement.  He explained at trial:  "By and large, things were going well. . . . [James] had handled a lot of difficult things in that office when he first got there with different people and so on.  The issue with Kristin Kahle was, in and of itself, not a strong enough issue to be a concern about his ongoing employment."

D.    *The Konecki Agency Acquisition*

In late 2012, the Agency acquired a local insurance agency run by John and Carolyn Konecki.  Some individuals involved in discussions about the acquisition were concerned about whether the Koneckis would be a good fit for the Agency.  At trial, the parties disputed whether James was one of the dissenting voices during a conference call that Leavitt held on the eve of the

---

[3]    The Employment Agreement was signed by Callister as CEO of the Agency.  By February 2014, Utterback had apparently replaced Callister as the Agency's CEO.  It is not clear from the record when the replacement occurred.  The evidence at trial established that the Agency's board of directors was comprised of Leavitt, Utterback, and James.

9

acquisition.  Ultimately, despite dissent, Leavitt decided to go forward with the purchase.

Integrating the Konecki Agency into the Agency proved to be extremely challenging.  As it turned out, the Koneckis were difficult people; Utterback testified they "wreaked havoc."  John was "volatile" and abusive to staff, and was terminated by James in August 2013 for inappropriate behavior.  Carolyn was "just plain mean" and contributed to creating a "horrible, horrible environment."  The Konecki Agency's accounts were "dinky," so the Agency's staff was "deluged with [a] huge amount of small accounts" that needed immediate attention.

Ultimately, however, financial reports showed the Agency was able to retain the Koneckis' business, which "pleasantly surprised" Leavitt.  Utterback, however, testified:  "If . . . any of us would have known how [the Koneckis] were going to behave and what a pain they were, I think all of us would have nixed the deal."

E.     *The Linnert Consultations*

Patrick Linnert was an outside business consultant and a friend of Utterback's.  He was retained by LGE to hold meetings with agency owners about improving "[s]ales and retention."  The consultations with Linnert were considered optional.

In October 2012, Linnert met with James, Utterback, and others to "start to develop a business plan" for the Agency.  During the meeting, Linnert created a list of action items, such as "instituting a . . . fun committee or culture committee," putting up a wall chart that depicted race cars to track employee progress, and talking to co-owners of other agencies to "[l]everage [their] knowledge base."

10

In April 2013, Linnert had a follow-up meeting with James, Utterback, and others to discuss James's progress on the action items. James testified at trial that he had completed many of the action items by this time, although he did not put up the wall chart with the race cars because he felt it was "juvenile" and unnecessary.

Linnert, on the other hand, felt "[t]he great majority of things had not been accomplished." It was agreed during the April 2013 meeting that James would "start executing these things." Linnert told Utterback he was "disappointed" but "cautiously optimistic." After the April 2013 meeting, James sent Utterback an email stating he was "back and ready to resume his role as a leader." James explained at trial that before the second consultation with Linnert, he had been weary from dealing with challenges like the Konecki acquisition, but he had been "fired . . . up" by the meeting.

In May 2013, Linnert had a short meeting with James to discuss "defining [the Agency's] culture and mission statement and values." Afterward, Linnert and James spoke privately, and James told Linnert he needed to put development of a mission statement "on hold" until the Koneckis were dealt with, because "[i]t was too combative an environment within the organization with the Koneckis." Linnert's view of this interaction was that James was communicating that "the things [they] had agreed to and talked about weren't going to happen." Linnert told James he "didn't want to work with him anymore and his job was in jeopardy." Linnert reported the conversation to Utterback.

F.    *The Termination Decision*

Meanwhile, Utterback and Leavitt were souring on James's performance. Utterback held conference calls with middle-market agency co-owners, including James, during which Utterback told co-owners to conduct business meetings with their producers on "new and renewal" large accounts.

11

Utterback learned later that James was not holding these meetings. Utterback also noticed that during in-person conferences with agency co-owners that were intended to allow co-owners to collaborate on ways to generate business and "develop a mutually agreed-upon culture," James's participation was "nonexistent."

Utterback was also dissatisfied with the Agency's financial progress. He observed a "[l]ack of growth, lack of production by individual producers, . . . those kind of things." The Agency suffered a financial loss in 2010. In 2011, it earned profits of $135,000. In 2012, it again suffered a loss. In 2013, it had net profits of $304,250.87. Utterback considered even the 2013 financial results to be a poor performance. The financial growth the Agency was generating was attributable to Kahle's "phantom income" or to "acquisition growth," such as the Konecki acquisition, and did not represent "organic growth."

Leavitt observed during a cross-agency meeting in Las Vegas that James seemed resistant to receiving suggestions from others. He concluded from this observation and from Linnert's feedback that James had a "consistent level of . . . inaction and lack of responsiveness," and that the Agency would not improve under James's leadership. Leavitt decided "we needed to terminate Mr. James eventually." He did not inform James of his decision out of concern this might lead to "infidelity."

LGE personnel identified Ed Nokes as a candidate to replace James and began efforts to recruit him in August 2013. By November 2013, Leavitt had decided to hire Nokes and terminate James. On November 15, Leavitt sent an email to Utterback and another LGE employee asking them to come up with a "transition plan of leadership" and a "detailed communication plan"

to James. Utterback ultimately decided to expedite James's termination after learning there was about to be an exodus of employees.

Also in November 2013, Mark Crawford, a young producer hired by James, started working at the Agency. Utterback had agreed with the decision to hire Crawford on the condition that James would mentor him. James scheduled appointments for Crawford and explained the process for transferring accounts over to the Agency. However, Crawford canceled some appointments and did not seem to be transferring over his clients. After a short time, James became concerned and talked to Crawford about his lack of follow-through.

On December 19, 2013, James attended a scheduled budgeting meeting with Utterback at the Agency's office. At the start of the meeting, Utterback told James, "we are heading in a different direction and we are going to be replacing you as the president of the office." In response, James acknowledged he "didn't like" managing. They discussed the possibility of James staying on at the Agency as a producer. Utterback asked James to continue as president until January 3, 2014, when his replacement would take over.

James testified he was shocked to find out he was being replaced. He had no warning "this was on the horizon." Soon after the meeting with Utterback, James learned that Nokes was his replacement. He met with Nokes at the end of December 2013. Nokes proposed that James take 90 days off and return to the Agency as a producer. James found the compensation Nokes was offering to be unacceptably low and concluded it was not "a sincere offer" and that "[t]hey were trying to get rid of [him]." James told Nokes he "wasn't making any commitments at this time" and was

13

focusing on "trying to get the value for [his] stock and also [his] employment contract."

On January 1, 2014, Utterback emailed himself a list of "[i]ssues that caused [James] to be terminated for cause." The items on his list included: "[p]erpetual disregard to direction of majority owner"; "[c]ontinued poor financial performance"; "[r]efusal to make adjustments in staff (over staffed)"; "[o]ngoing complaints from San Diego staff that [James] was removed from every day management" and placed "divisive" and "poor managers" in charge; and that James "was told he needed to become a better manager" during the second meeting with Linnert and had promised to change, but then failed to make "changes he committed to doing."

G.    *The Stock Valuations*

After January 3, 2014, James had a series of communications with Utterback about LGE providing a buy-out offer for his stock. James's ownership share in the Agency had by this point been reduced to 14 percent as the result of two stock issuances.

The first stock issuance occurred in late 2012 in connection with the financing of the Konecki Agency acquisition. The Agency could not fund the acquisition on its own, so the acquisition was partly funded through a capital contribution from  shareholders.

Kelly Russell, LGE's Chief Affiliations Officer and a lifetime LGE employee, but not a licensed certified public accountant, analyzed the value of the Agency's stock in connection with the stock issuance. Russell calculated that James would need to contribute $202,880 to maintain his 25 percent ownership interest in the Agency. No one from LGE explained Russell's valuation methods to James, and James assumed the calculation was accurate. James decided not to contribute. Thus, LGE supplied the required capital and was issued additional shares, and James's ownership percentage

14

was reduced from 25 percent to 20.2 percent. This transaction was memorialized in a stock issuance agreement between LGE and James with an effective date of December 1, 2012.

The second stock issuance took place in 2013 as part of a restructure of the Agency's debt to LGE. Russell again prepared the business valuation to determine the value of the Agency's stock. Based on Russell's valuation, a list of contribution amounts was sent to James; each amount was associated with a different resulting ownership percentage. No one from LGE explained the valuation methodology to James. James did not consult with an outside expert because he "didn't think there was any problem with trusting partners." James decided to contribute $205,000, which, pursuant to Russell's calculations, caused his ownership interest to be reduced to 14 percent. This transaction was memorialized in a second stock issuance agreement between LGE and James that was signed in July 2013 but had an effective date of January 1, 2013.

Thus, when James sought a buyout of his stock from LGE, it was this 14 percent ownership interest he was attempting to liquidate. On January 31, 2014, James was advised that LGE valued his 14 percent interest in the agency at $358,111. James did not think this valuation was accurate, since just six months earlier, he had paid $205,000 for "basically 6 percent of the company." He figured his stock was worth "a half million dollars if not more."

It turned out that, unbeknownst to James, LGE was simultaneously negotiating to sell Nokes the 14 percent ownership interest held by James. In August 2013, LGE provided Nokes a pro forma valuation (that is, a valuation based on the company's estimated future performance) that stated the 14 percent interest was worth $869,000. Nokes thought this was too

15

high.  By the time of the jury trial, Nokes and LGE had agreed on a purchase price of roughly $665,000.

H.    *The Termination Letter*

On February 12, 2014, Utterback sent James a written letter notifying James of his termination for good cause, effective April 3, 2014.  The letter stated:

> "Among the facts and circumstances supporting the conclusion that good cause exists for the termination of your employment are the following:
>
> "•      You met with other members of the Agency's management in strategic planning sessions on April 8 and May 23.  In those meetings, management agreed that you would implement certain measures designed to enhance the accountability of the Agency's producers for their performance, and to improve the Agency's financial performance.  You have refused and neglected to implement those measures.
>
> "•      You hired Mark Crawford as a new producer for the Agency, but you have failed to offer him any guidance or assistance in his transition.
>
> "•      Interviews with Agency staff members reveal that you would typically arrive at the office between 9:30 and 10:00 a.m., take a two hour lunch, and then leave the office by 4:00 p.m. While at the office, you would have your door closed, and would engage in very minimal interaction with the Agency's staff."

James was 61 years old at the time of his separation from the Agency. At the time of trial in 2018, he was still unemployed.  He testified he had tried to find work but "had a non-compete agreement" with the Agency that left him with "no book of business," and "nobody is interested in anybody without a book of business."

*Procedural Background*

On June 26, 2015, James filed the underlying action against LGE and the Agency. His original complaint stated causes of action for breach of contract against the Agency, intentional interference with contract against LGE, breach of fiduciary duty against LGE, and declaratory relief against LGE. The case was assigned to Judge Hayes.

James was later granted leave to amend the complaint after allegedly learning for the first time during discovery about the pro forma valuation LGE had given Nokes in 2013. James argued this valuation led him to discover that the Agency's stock had been undervalued during the two stock issuances, and as a result, his ownership interest had been unfairly diluted.

On April 24, 2017, James filed the operative amended complaint, which contained new allegations against LGE in support of the breach of fiduciary duties cause of action, based on the stock issuances, and added a new cause of action against LGE and the Agency for reformation of the two stock issuance agreements.

Defendants filed a general denial to the amended complaint in which they asserted an affirmative defense based on the running of the statute of limitations.

A. *The Bifurcated Trial*

The parties agreed the causes of action for breach of contract and intentional interference with contract were legal claims that should be tried to a jury, and that the causes of action for breach of fiduciary duty, declaratory relief, and reformation of stock agreements were equitable claims that should be tried to the court.

Although James agreed the trial should be bifurcated, he argued he should not be limited in the evidence he presented to the jury. He argued the

facts underlying all of his causes of action were intertwined, as his theory of wrongful termination was that LGE had manufactured cause to terminate him as a pretext to reacquire his shares and resell them at a higher price to Nokes. Thus, he argued, evidence of the stock dilutions and alleged unfair valuations of the agency should be admissible during the jury trial.

The court granted bifurcation. Over Defendants' objections, the court ruled that evidence and expert testimony relating to the valuation of the Agency in connection with the two stock issuances could be presented to the jury in the first phase of trial.

1. *The Jury Trial*

The jury trial was held over the course of 10 days in March and April 2018. James's trial presentation included testimony from James, Nokes, and Warren Burkholder, a business appraisal expert.

James testified he performed his duties under section 2.03 of the Employment Agreement, and although during his tenure as president he had received suggestions from Linnert and Utterback, no one at LGE had criticized him or instructed him on what to do. Burkholder testified that Russell had calculated the Agency's business value using an EBIDTA (earnings before interest, taxes, depreciation, and amortization) analysis that was subjective and arbitrary. He opined that Russell's analysis understated the value of the shares at the time of the two stock issuances, and that James's ownership interest would have been 17.53 percent, rather than 14 percent, after the two transactions, if the shares had been properly valued according to their fair market value.

The defense presentation included testimony from Leavitt, Utterback, Linnert, Russell, and Stephen Zamucen, a business appraisal expert.

Leavitt testified he believed there was good cause for James's termination based on "a pattern of inaction to repair, a lack of production to

18

. . . stem the tide of losses in the [A]gency, the lack of oversight and negligence in oversight of the matter with Ms. Kahle, his unwillingness to engage directly with a peer group and with consultants who were brought in to assist him." He testified James was "never defiant" but was "consistent in his inaction or attention to what [they] suggested." He admitted, however, that he never gave James "a direct instruction that he did not follow." Utterback's and Linnert's testimony was as we previously set forth in the factual summary.

Russell testified to the methods by which he valued the Agency's business in connection with the two stock dilutions, and the subsequent negotiations with Nokes. He relied on EBITDA to measure the value of agencies as part of his regular duties. He had presented his valuations of the Agency to LGE operations personnel and did not know whether anyone had discussed them with James. Zamucen, relying on an EBIDTA analysis, opined that the Agency was actually worth less than Russell had calculated, and that James's resulting ownership interest should have been 11.3 percent rather than 14 percent.

After deliberating for a little more than two days, the jury returned a split verdict. It found in favor of James on his cause of action for breach of contract against the Agency. In response to a special verdict question that asked, "Did Thomas James substantially perform his job duties under his employment agreement with [the Agency]?," nine jurors answered "Yes," and three jurors answered "No." In response to a special verdict question that asked, "Did the Agency discharge Thomas James without good cause?," 10 jurors answered "Yes," and two jurors answered "No." The jury awarded James $1,103,000 in past economic loss and $191,100 in future economic loss as breach of contract damages.

19

The jury found in favor of LGE on James's cause of action for intentional interference with contract, upon concluding that LGE did not intend to cause the Agency to breach the Employment Agreement with James.

2. *The Bench Trial*

A bench trial on the remaining causes of action was held on May 21, 2018, and was completed in less than a day. Most of the evidence had already been admitted during the jury trial. The only additional evidence presented during this phase of trial was testimony from James relating to his delayed discovery of the undervaluing of his stock during the two stock issuances, to counter Defendants' statute of limitations defense.

After hearing argument from counsel, the trial court directed the parties to submit proposed statements of decision. Each side filed its respective proposed statement of decision on June 12, 2018. On August 7, the trial court issued a minute order asking the parties to brief a hypothetical question not relevant to this appeal. One month later, the parties filed the requested briefs.

On October 17, 2018, rather than adopt either party's proposed statement of decision verbatim, the trial court issued its own nine-page tentative statement of decision. The court found, among other things, that LGE had breached its fiduciary duties as a majority shareholder in connection with the two stock issuances, causing James's ownership percentage to be unfairly reduced. It granted reformation of the stock issuance agreements to reflect that James's ownership in the Agency was 17.53 percent rather than 14 percent. It found that James's equitable claims were not time-barred, denied James's request for punitive damages, and concluded the issues raised in James's cause of action for declaratory relief were "moot."

20

The last sentence of the tentative statement of decision stated, "Absent timely query or objection, in 15 court days the Tentative Decision will become the Court's final decision in this matter." Judge Hayes signed and dated the tentative statement of decision. On November 6, 2018, Defendants timely filed objections to the tentative statement of decision.

B.    *The Case Is Reassigned to Judge Medel*

On November 7, 2018, Judge Richard S. Whitney issued a minute order directing James to file a supplemental brief addressing the objections. On November 10, a notice of case reassignment was issued by the superior court providing that effective immediately, the case was reassigned to Judge Whitney, "due to the following reason: Judicial Reassignment." Documents filed later in the case indicate counsel were informed Judge Hayes had retired. On November 26, James's peremptory challenge to Judge Whitney was granted,, and the case was reassigned to Judge Medel.

On June 18, 2019, Defendants filed a motion for partial new trial, arguing Judge Hayes's unavailability to finalize the statement of decision mandated a new bench trial. On July 22, Judge Medel denied the motion for partial new trial.

On September 16, 2019, based on the jury verdict and tentative statement of decision, Judge Medel entered judgment awarding James $1,294,100, and requiring LGE to issue James stock sufficient to increase his ownership interest in the Agency from 14 percent to 17.53 percent.

On November 13, 2019, Defendants filed a motion for new trial asserting alleged instructional error during the jury trial. Defendants also filed a motion for partial JNOV in which they argued certain findings in the tentative statement of decision were "incurably inconsistent," both internally and in relation to factual disputes resolved by the jury.

21

On January 23, 2020, the trial court issued a minute order denying both of these motions. Defendants filed a notice of appeal on February 14, 2020.[4]

## DISCUSSION

### I.

### *The Trial Court Committed Instructional Error, but the Error Was Not Prejudicial*

A.    *Additional Background*

The parties' joint trial readiness conference report listed Judicial Council of California Civil Jury Instructions (2020) (CACI) No. 2405 as one of the pattern instructions requested by James. CACI No. 2405 is titled "Breach of Implied Employment Contract — Unspecified Term — 'Good Cause' Defined — Misconduct," and is patterned on the California Supreme

---

[4]    Judge Medel's minute order denying Defendants' motions noted the parties' briefs revealed they were in agreement that the special verdict exceeded the evidence of damages presented to the jury. Judge Medel thus ordered the judgment relating to the breach of contract cause of action reduced to $1,112,952.80, and directed James to submit an amended judgment. Defendants' notice of appeal stated that Defendants were appealing from the judgment entered September 16, 2019, the minute order entered January 23, 2020, and the "[a]mended [j]udgment" which they stated was "not yet filed." The record before us does not include an amended judgment. However, it was proper for Defendants to take their appeal from the original judgment and orders denying their posttrial motions, rather than wait for the amended judgment, since the amendment ordered by the court only changed the amount of damages, which is not at issue in this appeal. (See *ECC Construction, Inc. v. Oak Park Calabasas Homeowners Assn.* (2004) 122 Cal.App.4th 994, 1003, fn. 5 ["[Because] the amendment changed the amount of damages only and did not otherwise alter the bases for defendant's appeal, defendant was required to appeal from the original judgment, not wait for the amended judgment."].)

22

Court decision *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93 (*Cotran*).[5]

On the third day of trial, counsel advised the court they had been unable to agree this instruction should be given. Both sides filed briefs stating their respective positions on whether CACI No. 2405 applied to James's breach of contract cause of action. Before the start of closing arguments, the trial court heard argument from counsel on the appropriateness of the instruction. James argued *Cotran* created procedural protections for employees that are to be inserted into "all employment agreements[,] not just implied agreements." Defendants essentially argued that *Cotran* did not apply to an express contract with its own definition of good cause.

The trial court agreed with James that the instruction should be given. It reasoned that under *Cotran*: "[B]efore you fire someone, you at least have to tell them why, give them a chance to answer" and "[i]f you don't address that procedural aspect in the contract with good cause, then that becomes an

---

[5] The CACI No. 2405 pattern instruction states: "[*Name of plaintiff*] claims that [*name of defendant*] did not have good cause to [discharge/demote] [him/her/nonbinary pronoun] for misconduct. [*Name of defendant*] had good cause to [discharge/demote] [*name of plaintiff*] for misconduct if [*name of defendant*], acting in good faith, conducted an appropriate investigation giving [him/her/nonbinary pronoun/it] reasonable grounds to believe that [*name of plaintiff*] engaged in misconduct. [¶] An appropriate investigation is one that is reasonable under the circumstances and includes notice to the employee of the claimed misconduct and an opportunity for the employee to answer the charge of misconduct before the decision to [discharge/demote] is made. You may find that [*name of defendant*] had good cause to [discharge/demote] [*name of plaintiff*] without deciding if [*name of plaintiff*] actually engaged in misconduct."

implied term . . . . Otherwise, an employee who has a good cause contract in reading it would be left to believe that they have more protection than an at-will employee. But they don't."

The court deleted the word "implied" from the title of the CACI No. 2405 pattern instruction and instructed the jury with the following modified version:

> "Breach of Employment Contract — 'Good Cause' Defined — Misconduct:
>
> "Plaintiff, Thomas James, claims that Defendant [Agency] did not have good cause to discharge him for misconduct. Defendant [Agency] had good cause to discharge Plaintiff, Thomas James for misconduct if Defendant [Agency,] acting in good faith, conducted an appropriate investigation giving it/them [sic] reasonable grounds to believe that Plaintiff, Thomas James, engaged in misconduct. [¶] An appropriate investigation is one that is reasonable under the circumstances and includes notice to the employee of the claimed misconduct and an opportunity for the employee to answer the charge of misconduct before the decision to discharge is made. You may find that Defendant [Agency] had good cause to discharge Plaintiff, Thomas James without deciding if Plaintiff, Thomas James actually engaged in misconduct. [¶] The terms, 'Good Cause'/'Misconduct,' are defined as follows: [¶] 1. Gross dereliction of duties; and/or [¶] 2. Persistent refusal to follow instructions."

The court also gave a separate instruction titled "Definition of Good Cause," which stated, "The Employment Agreement between Plaintiff and Defendant Leavitt Group Agency of S[a]n Diego, Inc., defines 'Good Cause' as follows: [¶]. . .[¶] 1) Employee's gross dereliction of duties; or, [¶] 2) Employee's persistent refusal to follow the instructions of Agency's President or Chief Executive Officer, or its Board of Directors."

B.   *Analysis*

Defendants contend the trial court committed reversible error by instructing the jury with the modified version of CACI No. 2405 set forth

above. They contend that *Cotran* as well as the CACI No. 2405 pattern instruction apply to implied employment contracts, not express employment contracts. They further argue that since James did not allege a cause of action for breach of implied contract, and the only agreement before the court was an express contract, it was error for the court to give the instruction. By doing so, the trial court effectively held them "to procedures [they] neither agreed to nor understood to exist."

We agree with Defendants and conclude the trial court erred by giving the challenged instruction, but upon reviewing the record, we find the error was not prejudicial.[6]

1. *Standard of Review*

Challenges to jury instructions are reviewed de novo, as a matter of law. (*Haytasingh v. City of San Diego* (2021) 66 Cal.App.5th 429, 467.) "A party is entitled to an instruction on each theory of the case that is supported by the pleadings and substantial evidence if the party requests a proper instruction." (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 684 (*Bullock*); see *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*) ["A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case."].)

---

[6] Defendants raise the issue of instructional error by way of arguing that the trial court abused its discretion in denying their second motion for new trial, which was based, in part, on alleged prejudicial instructional error. Because we conclude the instructional error was not prejudicial, the trial court did not err in denying Defendants' motion for new trial. (See Code Civ. Proc., § 657 [new trial may be granted only for causes "materially affecting the substantial rights" of the moving party].)

25

2.    *The Trial Court Committed Instructional Error*

Before discussing *Cotran*, we set forth certain principles relevant to employment relationships and their termination.  In California, the statutory presumption is that employment relationships are terminable at will.  (Lab. Code, § 2922.)  "Labor Code section 2922 provides that '[a]n employment, having no specified term, may be terminated at the will of either party on notice to the other.'  An at-will employment may be ended by either party 'at any time without cause,' for any or no reason, *and subject to no procedure except the statutory requirement of notice*."  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 335 (*Guz*), italics added.)

"While the statutory presumption of at-will employment is strong, it is subject to several limitations.  For instance, as [our high court has] observed, 'the employment relationship is fundamentally contractual.'  [Citation.]  Thus, though Labor Code section 2922 prevails where the employer and employee have reached no other understanding, it does not overcome their 'fundamental . . . freedom of contract' to depart from at-will employment.  [Citation.]  The statute does not prevent the parties from *agreeing* to any limitation, otherwise lawful, on the employer's termination rights."  (*Guz, supra*, 24 Cal.4th at pp. 335–336.)

"One example of a contractual departure from at-will status is an agreement that the employee will be terminated only for 'good cause' [citation] in the sense of ' " 'a fair and honest cause or reason, regulated by good faith . . .' " [citation], as opposed to one that is "trivial, capricious, unrelated to business needs or goals, or pretextual . . . ." [Citations.]' [Citations.]  But the parties are free to define their relationship, including the terms on which it can be ended, as they wish.  The parties may reach *any* contrary understanding, otherwise lawful, 'concerning either the term of

employment or the *grounds or manner* of termination.' " (*Guz, supra*, 24 Cal.4th at p. 336.)

"Thus, the employer and employee may enter ' "an agreement . . . that . . . the employment relationship will continue indefinitely, pending the occurrence of *some event such as* the employer's dissatisfaction with the employee's services or the existence of some 'cause' for termination." ' [Citations.] Among the many available options, the parties may agree that the employer's termination rights will vary with the particular circumstances. The parties may define for themselves what cause or causes will permit an employee's termination and may specify the procedures under which termination shall occur. The agreement may restrict the employer's termination rights to a greater degree in some situations, while leaving the employer freer to act as it sees fit in others." (*Guz, supra*, 24 Cal.4th at p. 336.) "The contractual understanding need not be express, but may be *implied in fact*, arising from the parties' *conduct* evidencing their actual mutual intent to create such enforceable limitations." (*Ibid.*)

An implied-in-fact employment agreement not to terminate except for good cause may arise from factors such as " 'the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged.' " (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 680; see also *Pugh v. See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 329, 330 (*Pugh*).) In *Pugh*, the Court of Appeal held that for purposes of an implied employment agreement, "[t]he terms 'just cause' and 'good cause,' . . . [Citation.] . . . connote 'a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power.' " (*Pugh*, at p. 330.) And

27

in *Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454 (*Scott*), our high court "elaborated on the content of good or just cause by enumerating what it is *not*: reasons that are ' "trivial, capricious, unrelated to business needs or goals, or pretextual." ' " (*Cotran*, *supra*, 17 Cal.4th at p. 96, quoting *Scott*, at p. 467.)

In *Cotran*, our high court further developed the jurisprudence relating to implied-in-fact employment agreements by deciding the standard to be applied by the jury when it reviews a termination decision made pursuant to an implied-in-fact employment agreement not to terminate except for good cause, where " 'good cause' " has the meaning decided in *Scott* and *Pugh*, referred to as the "the *Scott-Pugh* standard." (*Cotran*, *supra*, 17 Cal.4th at pp. 95–96.)

The plaintiff in *Cotran* was the senior vice president of an insurance brokerage. His implied employment agreement arose from preliminary negotiations with the employer and from a letter stating if he did not succeed he would be provided " 'other opportunities' within the organization." (*Cotran*, *supra*, 17 Cal.4th at p. 96, fn. 1.) After working at the firm for several years, he was fired after someone reported that he had been sexually harassing two employees. (*Id*. at pp. 96–97.) Senior managers interviewed him about the accusations and explained that an investigation would ensue. (*Id*. at p. 97.) An equal employment opportunity manager conducted the investigation, which entailed interviewing 21 people, including five suggested by the plaintiff. (*Ibid*.) The manager concluded that while there was no definitive evidence of misconduct, the accusers were credible, and it was more likely than not the harassment had occurred. (*Id*. at pp. 97–98.)

At trial, the plaintiff denied sexually harassing his accusers. He claimed his relationships with them, though sexual, had been consensual,

that the alleged victims had ulterior motives for accusing him, and that he had not disclosed these facts when he was interviewed because he "was upset, 'frightened,' and felt 'ambushed.' " (*Cotran, supra*, 17 Cal.4th at p. 98.) The employer sought to defend its decision to fire plaintiff "on the ground that it had been reached honestly and in good faith, not that [it] was required to prove the acts of sexual harassment occurred." (*Cotran, supra*, 17 Cal.4th at p. 99.) The trial court disagreed this was a viable defense, and instructed the jury that " '[w]hat is at issue is whether the claimed acts took place . . . . The issue for the jury to determine is whether the acts are in fact true.' " (*Ibid.*) The jury returned a special verdict for plaintiff based on the finding he had not " 'engaged in any of the behavior' " on which the termination decision was based. (*Ibid.*)

The *Cotran* court concluded the jury's decision was based on an erroneous standard. It began by observing that under *Pugh*, " '[t]he terms "just cause" and "good cause," . . . connote "a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power." ' " (*Cotran, supra*, 17 Cal.4th at p. 100, quoting *Pugh, supra*, 116 Cal.App.3d at p. 330.) It observed that in applying this standard, however, " '[c]are must be taken . . . not to interfere with the legitimate exercise of managerial discretion. . . . And where . . . the employee occupies a sensitive managerial or confidential position, the employer must of necessity be allowed substantial scope for the exercise of subjective judgment.' " (*Cotran*, at p. 100.) " '*Although the jury must assess the legitimacy of the employer's decision to discharge, it should not be thrust into a managerial role.*' " (*Id.* at p. 101, quoting *Pugh*, at p. 769.)

The *Cotran* court then canvassed authorities in search of a standard that would not overly restrict the employer's exercise of managerial

29

discretion. (*Cotran, supra*, 17 Cal.4th at pp. 100–107.) It rejected a standard that would put the jury in the role of conducting a de novo review of the factual basis for the termination decision. (*Id.* at pp. 102–103; see *id.* at p. 104 [" '[A]llowing a jury to trump the factual findings of an employer' " would turn the jury into an " 'ex officio "fact-finding board," unattuned to the practical aspects of employee suitability.' "].) Instead, it adopted a "middle ground" standard intended to balance "the employee's interest in continuing employment with the employer's interest in efficient personnel decisions." (*Id.* at p. 103.) Under this standard, the jury "assess[es] the *objective reasonableness* of the employer's factual determination of misconduct." (*Ibid.*)

Our high court stated the governing standard as follows: "We give operative meaning to the term 'good cause' *in the context of implied employment contracts* by defining it, under the combined *Scott-Pugh* standard . . . as fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual. A reasoned conclusion, in short, supported by substantial evidence gathered through an adequate investigation that includes notice of the claimed misconduct and a chance for the employee to respond." (*Cotran, supra*, 17 Cal.4th at pp. 107–108, italics added.) At the same time, however, the court noted that "[w]rongful termination claims founded on an *explicit* promise that termination will not occur except for just or good cause may call for a different standard, depending on the precise terms of the contract provision." (*Id.* at p. 96, fn. 1.)

For a number of reasons, we conclude the trial court erred in instructing the jury with the *Cotran* standard. First, the breach of contract cause of action in this case arose from an express agreement with an "*explicit*

30

promise that termination will not occur except for just or good cause." (*Cotran, supra,* 17 Cal.4th at p. 96, fn. 1.) The holding of *Cotran* applies to implied-in-fact agreements under which "good cause" for termination is defined in accordance with *Scott* and *Pugh*. Other courts have declined to apply *Cotran* in cases involving express employment agreements with provisions that allow termination on grounds other than those articulated in *Scott* and *Pugh*. (*Halvorsen v. Aramark Uniform Services* (1998) 65 Cal.App.4th 1383, 1390–1391 ["*Cotran* . . . expressly applies only to cases in which an employee is under an '*implied* agreement not to be dismissed except for "good cause." ' "]; *Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32, 57 (*Khajavi*) [stating that the analysis of *Cotran* is "expressly limit[ed] . . . to implied-employment agreements"].)

Second, the Employment Agreement defined "good cause" in a way that was more protective of James, and more restrictive of the employer's right of termination, than the *Scott-Pugh* good cause standard. The parties' decision to clearly delimit the conduct warranting termination was an indication termination could not be justified based on an honest but mistaken belief that such conduct actually occurred. *Khajavi* helps illustrate this point. In that case, the plaintiff sued for breach of an oral employment agreement for a specified term. (*Khajavi, supra*, 84 Cal.App.4th at p. 55.) Such agreements are governed by Labor Code section 2924, which provides: "An employment for a specified term may be terminated at any time by the employer in case of any *willful breach of duty by the employee* in the course of his employment, or in case of his *habitual neglect of his duty* or continued incapacity to perform it." (Italics added; see *Khajavi*, at p. 57.)

The trial court in *Khajavi* rejected a jury instruction that would have allowed the jury to find in favor of the employer if it decided the employer, in

31

terminating the employee, acted " 'in good faith on an honest but mistaken belief' " the employee had committed a particular act of misconduct. (*Khajavi*, *supra*, 84 Cal.App.4th at pp. 55–56.) The Court of Appeal affirmed. It observed that the proposed instruction was intended for wrongful termination claims based on an implied contract with a good cause standard "quite different from the standard applicable in determining the propriety of an employee's termination under a contract for a specified term. (Cf. Lab. Code, § 2924.)' " (*Id.* at p. 56, quoting *Pugh*, *supra*, 116 Cal.App.3d at p. 330.) It reasoned Labor Code section 2924 "would not appear to allow termination for an honest but mistaken belief that discharge was required," because "[s]uch a termination would not be based on a willful breach of duty, a habitual neglect of duty, or a continued incapacity to perform." (*Khajavi*, at p. 57.)

Here, the " '[g]ood cause' " provision in the parties' agreement defined " '[g]ood cause' " for termination as "gross dereliction of duties" or "persistent refusal to follow . . . instructions," which are grounds for termination comparable to the "willful breach of duty" or "habitual neglect of . . . duty" for which an employee can be terminated under Labor Code section 2924. Thus, as in *Khajavi*, the parties' agreement "would not appear to allow termination for an honest but mistaken belief that discharge was required" (*Khajavi, supra,* 84 Cal.App.4th at p. 57), because such a termination would not be based on the conduct that the parties explicitly agreed would justify termination: gross dereliction of duties, or a persistent refusal to follow instructions.

Nor is it the case, as the trial court reasoned, that failure to apply *Cotran* results in James being less protected. In fact, the opposite is true. *Cotran* deprives an employee who is innocent of misconduct of recourse where

32

the employer acted under an honest, but mistaken belief the misconduct occurred. Declining to apply the *Cotran* standard means the employer bound by a contract not to terminate except for good cause must prove the factual accuracy of its termination decision to a jury. Such a standard is more protective of the employee, not less.

James argues that Justice Mosk's concurring opinion in *Cotran* "establishes that *Cotran* is not limited to implied employment agreements." James's reliance is misplaced. " ' "[A]ny proposition or principle stated in an opinion [of the Supreme Court] is not to be taken as the opinion of the court, unless it is agreed to by at least four of the justices." ' " (*Quinn v. U.S. Bank NA* (2011) 196 Cal.App.4th 168, 180, quoting *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 829.) A concurrence is not authoritative and cannot establish the view of the majority. Also, we do not read Justice Mosk's concurrence as James does. The concurrence, which at four paragraphs long is relatively brief, opens by observing "the majority's standard best approximates . . . the likely bargain struck . . . *in an implied contract* not to terminate except for good cause" and ends by confirming "the majority's good cause standard *does not extend beyond the context in which it is articulated, i.e., implied contracts between employers and individual employees*." (*Cotran, supra,* 17 Cal.4th at pp. 109, 110 (conc. opn. of Mosk, J.), italics added.) Although James dissects other parts of the text and finds evidence of a different view, it is plain from these quotes that Justice Mosk did not regard the majority opinion as extending beyond implied contracts with implicit good cause provisions.

James also argues that because the Employment Agreement was silent as to his "due process rights," he cannot be construed to have waived them. James's error is in assuming such due process rights are the rule. As our high court explained in *Guz*, however, this is not so: the default employment

33

relationship allows for termination at will, "*subject to no procedure except the statutory requirement of notice.*" (*Guz, supra*, 24 Cal.4th at p. 335, italics added.)[7]  Nor did *Cotran* hold, as the trial court suggested, that "before you fire someone, you at least have to tell them why, give them a chance to answer." (See, e.g., *McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1524, fn. 10 [explaining that *Cotran* did not hold that "all employees are entitled to notice and a fair hearing prior to being terminated for misconduct"].)  Rather, *Cotran* created a standard for the factfinder to apply when evaluating a termination decision under an implied employment agreement not to terminate except for good cause.  Evidence of an appropriate investigation is required when a termination decision is evaluated under this standard.

Because James's breach of contract cause of action arose from an express employment agreement with a good cause provision that restricted the Agency from terminating James unless he committed the specified acts of misconduct, the *Cotran* standard did not apply.  Thus, the trial court erred by giving the challenged instruction.  "A party is entitled to an instruction on each theory of the case that is supported by the pleadings and substantial evidence if the party requests a proper instruction." (*Bullock, supra*, 159 Cal.App.4th at p. 684.)  The court was not presented with pleadings or evidence sufficient to warrant giving the challenged instruction.  James's complaint alleged breach of the parties' express employment agreement only.  He did not allege the existence of an implied employment agreement, an implied contractual term granting him procedural protections in connection

_____

7      Here, the Employment Agreement provided that James could be terminated "upon forty-five (45) days advance notice."  Utterback's termination letter was sent on February 12, 2014, and, citing this notice provision, stated that James's termination would be effective April 3.

with his termination, nor did he allege breach of the implied covenant of good faith and fair dealing.[8]

Nor did James identify evidence that might have supported giving the instruction. On appeal, James argues that Leavitt's November 15, 2013 email is evidence that James was "entitled to a level of due process regarding his employment status." This argument lacks merit. An implied contract is one for which the "existence and terms . . . are manifested by conduct." (Civ. Code, § 1621.) The November 15 email discussed how James's removal, which at that point was a *fait accompli*, would be carried out. It did not state the decision to terminate James would or should be reached only after completion of an investigation in which he would receive notice of his alleged misconduct and the opportunity to respond. Thus, the email is not evidence

[8]     At oral argument, James's counsel asserted for the first time on appeal that a cause of action for breach of contract necessarily includes breach of the implied covenant of good faith and fair dealing. We need not and do not consider this point because it has been forfeited. First, James did not include this argument in his appellate briefing. (*Jones v. Jacobson* (2011) 195 Cal.App.4th 1, 19, fn. 12 ["issues and arguments not addressed in the briefs on appeal are deemed forfeited"].) Second, he did not preserve this issue for review. James's operative complaint was devoid of any allegations of breach of the implied covenant. If, as he seems to contend, his pleading embraced such a claim despite the lack of any allegations addressing it, then we would expect it to have been identified in the parties' joint trial readiness conference report as a legal issue in dispute, but it was not. When arguing in the trial court in favor of instructing the jury with the *Cotran* standard, James did not inform the court that he was pursuing breach of the implied covenant of good faith and fair dealing, nor did he assert that such a claim would support instructing the jury pursuant to *Cotran*. James's failure to pursue this position in the trial court forfeits the matter on appeal. (*Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564 ["Failure to raise specific challenges in the trial court forfeits the claim on appeal."].)

of an implied agreement granting James procedural due process rights in the matter of his termination.

 3. *The Error Was Not Prejudicial*

Civil instructional error is reversible only if "there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached." (*Soule*, *supra*, 8 Cal.4th at p. 574.) "A 'reasonable probability' in this context 'does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.' " (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 682.) "The reviewing court should consider not only the nature of the error, 'including its natural and probable effect on a party's ability to place his full case before the jury,' but the likelihood of actual prejudice as reflected in the individual trial record, taking into account '(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled.' " (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983.)

We have reviewed the record thoroughly and conclude the erroneous instruction was not prejudicial. The jury received two "good cause" instructions: the erroneous instruction under *Cotran* and the instruction that defined "good cause" in accordance with the parties' contract. No one disputes that the latter instruction was correct.

At trial, far more emphasis was placed on the Agency's substantive reasons for terminating James as compared with the process by which he was terminated. The parties' evidentiary presentations were largely addressed to James's performance as president and whether his performance fell short. To the extent the evidence related to the manner in which James was terminated, the focus was on whether the lack of communication signaled that the reasons given for his termination were not sincere but were

manufactured so LGE could reacquire his stock, as opposed to the presence or absence of an investigation of the factual accuracy of the grounds for James's termination.

The erroneous instruction received little attention from counsel during their arguments to the jury. In his opening statement, James's counsel told the jury: "The standard for good cause in this case is set by . . . Section 5.04 of Mr. James'[s] employment contract" and "[e]very single thing in this case that you hear about should relate to this standard." At the start of his closing argument, James's counsel reiterated that this contractual "definition of good cause" gave "perspective on all of the evidence that has been presented to [the jurors] in the case," and then focused on persuading the jury that James did nothing amounting to a "gross dereliction of duty" or a "persistent refusal to follow . . . instructions." When he referred to the erroneous instruction, he did so briefly and in passing; this part of the transcription of his closing argument consumed less than half a page of text out of 24 pages. For his part, defense counsel urged the jury to find James was a "complete failure and breached his agreement." He asserted that "if we didn't have good cause to fire him . . . they win the case," and "[i]f we did have good cause to fire him, this is over, . . . you're outta here, see you later, bye." Thus, the arguments of both attorneys emphasized the contractual definition of "good cause" and minimized any significance of the erroneous instruction.

The special verdict is itself a telling indication the jury was not misled by the erroneous instruction. In response to the first special verdict question relating to breach of contract, which asked, "Did Thomas James substantially perform his job duties under his employment agreement with [the Agency]?," the jury answered "Yes." Section 2.03 of the Employment Agreement listed James's job duties as president of the Agency and provided that his "precise

37

duties" could be "altered from time to time by the Board of Directors." The Employment Agreement defined "Good Cause" for termination in terms of James's *failure* to perform these duties (specifically, "gross dereliction of duties" and "persistent refusal to follow the instructions" of the Agency's board of directors). Thus, by finding that James "substantially perform[ed] his job duties under his employment agreement," the jury signaled its verdict in favor of James was based on the determination that his conduct did not meet the contractual definition of "good cause," as opposed to a finding his termination was procedurally inadequate.[9] The record thus suggests it is not reasonably probable a different outcome would have been reached on the breach of contract cause of action in the absence of the instructional error.

Defendants' arguments that the verdict was affected by the erroneous instruction are unpersuasive. They contend the jury's split verdict is evidence of its reliance on the erroneous instruction, because, so they claim, the only way to reconcile the defense verdict on the intentional interference with contract cause of action with the plaintiff's verdict on the breach of contract cause of action is to interpret the latter verdict as having been based on a finding the agency breached an "investigative duty . . . with an opportunity to cure," a contractual duty they contend was embraced by the breach of contract claim but not the intentional interference claim. We disagree. Both causes of action required a finding the employment agreement was breached; the jury was so instructed under CACI Nos. 2200

---

9    Nine jurors answered yes to this question, whereas 10 jurors answered yes to the special verdict question asking whether James was discharged without good cause. Whatever the reason for the one juror's vote, nine jurors agreed James substantially performed his job duties, which is a sufficient majority for a verdict in his favor.

and 2401.[10]  The jury could not, consistent with these instructions, find the Agency breached its contractual duties for purposes of one cause of action but not the other.  Instead, the logical way to reconcile the two verdicts is based on the element of intent, which the jury was instructed is required to prove intentional interference with contract, but not breach of contract.  (*Imperial Ice Co. v. Rossier* (1941) 18 Cal.2d 33, 37 ["The act of inducing the breach must be an intentional one.  If the actor had no knowledge of the existence of the contract or his actions were not intended to induce a breach, he cannot be held liable though an actual breach results from his lawful and proper acts."].)

Next, Defendants argue "there was more than substantial evidence of a persistent *failure* by Mr. James to abide by the Board of Directors', Messrs. Leavitt and Utterback, [sic] instructions."  (Italics added.)  We disagree with Defendants' characterization of their cited evidence, which is weak at best.  At the outset, we observe that the relevant definition from the parties' contract required "persistent *refusal* to follow the instructions of [the] Agency's . . . Board of Directors."  (Italics added.)  As evidence of an instruction from the board of directors (i.e., Utterback and Leavitt, since the third member was James), Defendants cite Utterback's testimony that after two conference calls during which Utterback instructed agency co-owners, including James, to meet with producers about business renewal, Utterback

---

10    The modified CACI No. 2401 instruction given to the jury informed it that James claimed the Agency breached the employment contract and set forth the factual elements James needed to prove to establish this claim.  The modified CACI No. 2200 instruction informed the jury that James claimed Leavitt intentionally caused the Agency to breach the employment contract, and stated that James had to prove LGE's conduct "caused [the Agency] to breach the contract" in order to establish this claim.

39

learned James was not conducting the meetings. However, Defendants cite no evidence Utterback was acting on behalf of the Agency's board of directors during the calls; moreover, whether James's inaction after these calls amounted to a "persistent refusal" to follow the instruction is debatable. Defendants' other cited evidence is similarly lacking. They contend Utterback instructed James to "make the Agency profitable," but identify no evidence James refused to do so. They point to Leavitt's dissatisfaction with James's level of participation during certain in-person conferences, and refer to James's failure to execute agreed action items from the Linnert meetings, but they fail to indicate these shortfalls involved a refusal to follow "instructions." If anything, Defendants' effort to demonstrate the strength of the evidence of good cause for James's termination only serves to highlight its weakness.

Defendants' other arguments are similarly unavailing. They argue the jury's vote of 10 to 2 in favor of James on the question whether his discharge was without good cause was "close enough" to indicate the jury was "misled" by the erroneous instruction. However, "[e]ven a verdict of 10 to 2 has been deemed 'not particularly close' [citation], and thus not helpful in assessing the impact of the instructional error." (*Krotin v. Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294, 305–306.)

Defendants also argue the jury "deliberated for three days, during which time they sent eight notes to the court." This statement is inaccurate. The jury began deliberating at 2:17 p.m. on April 3, 2018, and returned its verdict two days later, at 3:47 p.m. on April 5, 2018. During this time, they sent six notes, not eight; the last note simply informed the court they had reached a verdict. The jury's notes indicated much of its time was spent

40

deciding how to answer special verdict question number 13, which related to the intentional interference claim, not the breach of contract claim.

Defendants argue the trial court created confusion with its response to a jury note asking for a definition of "good faith," a phrase that appeared in the erroneous instruction as well as an instruction the jury received under CACI No. 2210 relating to the intentional interference with contract claim.[11] However, the record reveals defense counsel consented to the court's response, which forfeits Defendants' opposition to it on appeal. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 ["Inasmuch as defendant both suggested and consented to the responses given by the court, the claim of error has been waived."]; *People v. Ross* (2007) 155 Cal.App.4th 1033, 1048 ["A defendant may forfeit an objection to the court's response to a jury inquiry through counsel's consent, or invitation or tacit approval of, that response."].)

For all of these reasons, we are not persuaded the instructional error was prejudicial.

## II.

### *The Trial Court Did Not Err in Denying Defendants' Motion for Partial New Trial*

A.  *Additional Background*

In their motion for partial new trial, Defendants argued a new bench trial was required on the equitable portion of the case in light of Judge Hayes's unavailability to finalize her tentative statement of decision. Relying on *Mace v. O'Reilley* (1886) 70 Cal. 231 (*Mace*), *Swift v. Daniels* (1980) 103

_____

11    The court responded to the jury's inquiry as follows:  "Formulation of a precise definition of good faith, or bona fides, is neither possible nor practicable.  You are to determine the meaning of this term in light of the evidence, and in light of your life experience."

41

Cal.App.3d 263 (*Swift*), *Armstrong v. Picquelle* (1984) 157 Cal.App.3d 122 (*Armstrong*), and *Raville v. Singh* (1994) 25 Cal.App.4th 1127 (*Raville*), Defendants argued the unavailability of the judge who presided over the trial to "render her statement of decision" and "enter judgment in accordance therewith" was an irregularity in the proceedings that mandated a new bench trial. In their words, Judge Medel "can[not] do anything other than order a new trial of the equitable issues."

James opposed the motion. He argued that Judge Hayes's unavailability to finalize the statement of decision was of no moment as neither side had requested a statement of decision so as to trigger the requirements of Code of Civil Procedure section 632. He argued further that *Leiserson v. City of San Diego* (1986) 184 Cal.App.3d 41 (*Leiserson*) governed the matter, not the authorities cited by Defendants, and led to the conclusion judgment could be entered based on the tentative statement of decision. He also argued that under *F.P. v. Monier* (2017) 3 Cal.5th 1099 (*Monier*), any procedural error arising from Judge Hayes's unavailability did not require a new trial unless the error was prejudicial, and there was no such prejudice because Judge Hayes's tentative decision provided a complete and adequate basis for appellate review.

James also presented evidence of a November 26, 2018 email chain circulated among defense counsel, James's counsel, and a superior court clerk. In one of the emails in this chain, the superior court clerk stated, "[t]he plan is for Judge Hayes to complete the Statement of Decision." Defense counsel responded: "It was my understanding that Judge Hayes had retired. I don't know how she comes out of retirement to hear a matter other than by stipulation. Defendants are not stipulating to a retired Judge hearing this matter. . . . I would like clarification if [the] San Diego Superior Court is

42

allowing a retired Judge to complete the Statement of Decision.  If so, we will be filing an objection to that proceeding."  James argued Defendants could not claim to be prejudiced by Judge Hayes' unavailability to complete the statement of decision process when they had objected to having her return from retirement to do so.

On July 22, 2019, Judge Medel issued a minute order denying Defendants' motion.  Citing *Leiserson*, *supra*, 184 Cal.App.3d at pages 47–48, the court reasoned that:  "The general rule is the judge who hears the case must sign a Statement of Decision.  In this case, a statement of decision was rendered.  While it was labeled 'tentative,' it provided a complete and adequate basis for appellate review."  The court further observed that "[a]ny objections are preserved pending any appeal.  Judge Hayes' opinion provides a complete and adequate basis for appellate review and no violence is done to the princip[le] that 'the judge who hears the evidence should be the one to decide the case.' "  Judge Medel concluded that "[a]ny failure to properly rule on objections is, at best, harmless error.  The decision of Judge Hayes articulates findings after trial and can be a proper basis for appeal."

B.     *Analysis*

Defendants contend the trial court erred by denying their motion for partial new trial.  A trial court's decision to deny a motion for new trial is reviewed for an abuse of discretion.  (*Schelbauer v. Butler Manufacturing Co.* (1984) 35 Cal.3d 442, 452.)  An abuse of discretion arises where the trial court's action " 'transgresses the confines of the applicable principles of law.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)  Defendants fail to establish that the trial court abused its discretion by declining to order a new bench trial.

The trial court denied Defendants' motion based on its determination that any procedural error arising from the irregularity identified by

43

Defendants was harmless. This was the correct standard to apply. Code of Civil Procedure section 657 provides that a new trial may be granted where the substantial rights of a party have been materially affected by, among other causes, an "[i]rregularity in the proceedings of the court." A new trial cannot be granted based on error that is not prejudicial. (Cal. Const. Art. VI, § 13 ["No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."]; *Bristow v. Ferguson* (1981) 121 Cal.App.3d 823, 826 [" '[T]he trial court, no less than the appellate court, is expressly enjoined by article VI, section 4 1/2 [now § 13], of our Constitution from granting a new trial for error of law unless such error is prejudicial.' "].)

Further, in *Monier*, our high court held that where "the correct procedure was not followed before the court signed and entered the judgment" because "[d]efendant did not have the requisite time to file objections to the proposed judgment before the court signed and entered the judgment," this was a procedural error "subject to harmless error review." (*Monier*, *supra*, 3 Cal.5th at p. 1116.) Here, the trial court determined that Judge Hayes's failure to finalize the statement of decision was harmless because the tentative statement of decision "provides a complete and adequate basis for appellate review." That determination was within the bounds of the applicable legal principles. In *Monier*, the court suggested that " 'a trial court's failure to issue a statement of decision may at times require reversal in order for the appellate court to effectively perform a review of the

44

material issues.' " (*Id.* at p. 1116.) It therefore stands to reason that a tentative statement of decision that *does* allow an effective " 'review of the material issues' " should withstand harmless error review. (*Ibid.*)

And in *Leiserson*, which the trial court cited as supporting authority for its determination that the irregularity was "harmless error" that did not necessitate a new trial, the Court of Appeal affirmed the trial court's entry of judgment based on a statement of decision that was never finalized. (*Leiserson*, *supra*, 184 Cal.App.3d at pp. 47–48.) In that case, the trial judge who presided over the bench trial filed an " 'Intended Decision' " in favor of defendants that set forth his findings and conclusions. (*Id.* at p. 46.) Plaintiff filed objections to the " 'Intended Decision,' " and a hearing on the objections was commenced but never completed, because the trial judge died. (*Id.* at p. 47.) Defendants filed a motion for entry of judgment in which they represented that during the partially-completed hearing, the trial judge had indicated " 'his decision would remain the same.' " (*Id.* at pp. 47–48.) A different judge granted the request and entered judgment based on the " 'Intended Decision.' " (*Id.* at p. 48.) The Court of Appeal rejected plaintiff's claim that judgment had been improperly entered based on the " 'Intended Decision.' " The court reasoned, in part, that the " 'Intended Decision' . . . provides a complete and adequate basis for appellate review." (*Ibid.*) Although not expressed in terms of harmlessness or lack of prejudice, the *Leiserson* court was essentially applying harmless error analysis in rejecting the plaintiff's claim of error. The sequence of procedural events in this case was quite similar to the events that transpired in *Leiserson*. The trial court's harmlessness analysis in this case was thus appropriately premised on the reasoning in *Leiserson*.

45

A fatal flaw in Defendants' arguments, both in the trial court and on appeal, is their failure to argue or otherwise demonstrate that they were prejudiced by Judge Hayes's unavailability to complete the statement of decision process.[12]  Relying primarily on *Mace*, *Swift*, *Armstrong*, and *Raville*, they argued below and continue to assert on appeal that the wrong procedures were followed, and a new trial was "mandated."  To begin with, Defendants' authorities are distinguishable.  As the *Leiserson* court observed, "*Armstrong* and *Swift* . . . involve the very different situation where, although a tentative decision was rendered, no statement of decision was ever prepared or signed by the trial judge." (*Leiserson*, *supra*, 184 Cal.App.3d at p. 48.)  The same can be said of *Mace* and *Raville*.  (See *Mace*, *supra*, 70 Cal. at p. 232 [order for judgment was entered, "but no findings were filed or waived" (italics omitted)]; *Raville*, *supra*, 25 Cal.App.4th at p. 1129 [trial judge died after announcing tentative decision in open court].)

More to the point, though, although prejudice is manifestly required to order a new trial based on a procedural irregularity like the one Defendants complain of here, Defendants did not tender a prejudice argument in their opening brief on appeal.  In their reply brief, they assert for the first time

---

[12]  Another flaw is Defendants' failure to present argument establishing that we can overlook the absence of a request for a statement of decision.  A trial judge is not required to follow the statement of decision procedures in the absence of a proper request.  (Code Civ. Proc., § 632.)  Here, Judge Hayes directed the parties to submit proposed statements of decision, but Defendants do not argue or cite any authority establishing that they were thereby excused from filing a request identifying the controverted issues they wanted to be decided.  Because we resolve Defendants' challenge based on the lack of prejudice arising from Judge Hayes's failure to complete the statement of decision process, we need not and do not decide whether Defendants can insist on its completion despite their failure to initiate it by timely filing a proper request.

46

that their objections to the tentative statement of decision raised ambiguities and factual inconsistencies that could only be "explained and/or cured" by Judge Hayes. To the extent this argument is meant as an assertion of prejudice, it is forfeited because it is belated and unaccompanied by an explanation establishing good cause for the delay. (See, e.g., *Murray & Murray v. Raissi Real Estate Development, LLC* (2015) 233 Cal.App.4th 379, 388–389.) And even if the argument had not been forfeited, we would reject it. Defendants asserted below that they intended to object to Judge Hayes returning from retirement to rule on their objections and finalize the statement of decision, and can hardly be heard to complain now that this did not transpire. Also, most of Defendants' objections to the tentative statement of decision have reemerged as arguments on appeal that, as we shall discuss, lack merit. The only objection they have not reasserted on appeal did not support reversing the tentative statement of decision. Thus, Defendants fail to establish that their substantial rights were affected by Judge Hayes' failure to rule on their objections.

Accordingly, we find no abuse of discretion in the trial court's decision to deny Defendants' motion for partial new trial.

III.

*The Trial Court Did Not Err in Denying Defendants'*
*Motion for JNOV*

A. *Additional Background*

The tentative statement of decision found in favor of James on most, though not all, issues. The trial court ruled that James's equitable claims were not time-barred, based on the finding that James "did not actually discover the facts underlying his equitable claims until sometime in autumn of 2016, as a result of revelations in discovery, when he found that his 14 percent stock share was marketed for $869,585 to his replacement, Ed

47

Nokes." The court found the cause of action for declaratory relief was "now moot."

The trial court ruled in favor of James on his cause of action for breach of fiduciary duty, based on the finding LGE breached its fiduciary duty as a majority shareholder by valuing the shares below their fair market value in connection with the two stock issuances that resulted in reduction of James's percentage ownership of the Agency. The court "adopt[ed] Mr. Burkholder's reasoning as expressed in his testimony as establishing the value of [the Agency]." It found that after the first stock issuance, James's ownership interest should have been 21.53 percent (rather than 20.2 percent, as calculated by Russell), and after the second stock issuance, his ownership interest should have been 17.53 percent (rather than 14 percent, as calculated by Russell).

The trial court granted James's request for reformation of the stock issuance agreements, and ruled that "Plaintiff recovers a fair, if diluted, ownership in [the Agency], that is 17.53% ownership interest, for a total stock holding in the amount of 45,127 shares of stock in [the Agency]." However, the court declined to award punitive damages, stating it "does not find LGE acted with fraud, malice or oppression."

Defendants objected to the tentative statement of decision on the grounds that certain of the trial court's findings were internally inconsistent or conflicted with the jury verdict, or were otherwise unsupported by the evidence. In the motion for JNOV filed after Judge Medel entered judgment based on the tentative statement of decision, Defendants raised anew many of the errors asserted in their objections.

B.    *Analysis*

On appeal, Defendants contend their motion for JNOV was erroneously denied. "Generally, an appellate court reviews a trial court's ruling on such a

48

motion for sufficiency of the evidence supporting the verdict. [Citation.] However, review is de novo '[i]f the appeal challenging the denial of the motion for judgment notwithstanding the verdict raises purely legal questions.'" (*Markow v. Rosner* (2016) 3 Cal.App.5th 1027, 1045.) For the reasons we discuss, we reject each of Defendants' claims of error.

1. *The Tentative Statement of Decision Did Not Conflict with the Jury's Special Verdict*

Defendants contend the trial court's "finding of a breach of fiduciary duty is irreconcilably inconsistent with the jury verdict on the intentional interference with contract cause of action." (Boldface omitted.) As we explain, this contention lacks merit.

The section of the tentative statement of decision in which the court determined that LGE breached its fiduciary duties as a majority shareholder included a sentence that stated, "LGE's manipulation of [the Agency's] stock price to benefit itself at Plaintiff's expense, constituted a breach of its fiduciary duty to Plaintiff." Defendants seize on this sentence as evidence the court found the acts that constituted a breach of fiduciary duty were committed intentionally. They contend the jury reached the opposite conclusion when it answered "No" to the special verdict question, "Did [LGE] intend to cause the Agency to breach its employment contract with . . . James?" They argue the theory of intentional, pretextual misconduct offered at trial, but rejected by the jury, was the same misconduct the trial court found *was* committed intentionally. Thus, they contend, the trial court's decision conflicts with the jury's verdict.

"Issues adjudicated in earlier phases of a bifurcated trial are binding in later phases of that trial and need not be relitigated." (*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 487.) And "[w]here legal claims are first tried by a jury and equitable claims later tried

by a judge, the trial court must follow the jury's factual determinations on common issues of fact." (*Hoopes v. Dolan* (2008) 168 Cal.App.4th 146, 158.) However, no error arises where "[t]he court's determination was founded on issues of fact distinct from those supporting the jury verdict, and thus was not bound by that verdict." (*Id.* at p. 161.)

Here, there is no conflict, because the jury verdict and trial court decision were founded on distinct issues of fact. The theory of intentional interference with contract presented to the jury was that LGE manufactured grounds for terminating James so it could exercise its option to repurchase his stock and sell it at a higher price to Nokes. The trial court's determination that LGE breached its fiduciary duties was based on the finding that LGE undervalued the Agency's stock in connection with the two stock issuances, which caused James's percentage ownership in the Agency being overly reduced to 14 percent when it should have been 17.53 percent. The termination decision and negotiations with Nokes happened *after* James's ownership interest had already been reduced. Thus, the jury's verdict and the trial court's decision were based on events that were temporally distinct and involved different transactions.

We also disagree with Defendants' contention that the trial court's decision was based on a finding of intentional misconduct. " 'Even though a finding might have been more clearly phrased, it is sufficient if its language is clear enough to indicate what the court intended; and if there are findings sufficient to support the judgment, they are not vitiated by the unintelligibility of others. Any uncertainty in the findings will be construed so as to support the judgment rather than to defeat it.' [Citation.] Even where findings are to some extent inconsistent a judgment may not be set aside unless the conflict is clear and material and the findings are incapable

50

of being harmoniously construed." (*Richter v. Walker* (1951) 36 Cal.2d 634, 639 (*Richter*).)

Although the word "manipulation" in the quoted sentence from the trial court's decision arguably connotes acts committed with a particular goal or purpose, it is apparent from the decision as a whole the court did not find the underlying wrongs were committed intentionally. To begin with, intent is not an element of a cause of action for breach of fiduciary duties (see *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820 ["The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, breach of fiduciary duty, and damages."]), so the court did not have to find LGE acted with any intent in order to conclude it had breached its fiduciary duties.

The trial court, apparently intending to fend off arguments like the one Defendants now raise, expressly observed that "[w]hile [LGE] was not found liable for interference with Plaintiff's employment contract, *the elements of a cause of action for breach of fiduciary duty differ* as does the burden of proof." (Italics added.) It strains credulity to believe the court, having just acknowledged the jury verdict on the intentional interference with contract claim, would go on to render a decision that conflicted with it.

And while James alleged that LGE intentionally undervalued the agency to deprive him of his rightful ownership interest, the trial court rejected this theory when it denied his request for punitive damages on the basis that LGE had not "acted with fraud, malice, or oppression." (See Civ. Code, § 3294, subds. (c)(1) [defining " 'Malice' " to include "conduct which is *intended by the defendant to cause injury to the plaintiff*" (italics added)], (c)(3) [defining " 'Fraud' " as "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant *with the intention on*

51

*the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury*" (italics added)].)

Nor do we read the decision as inserting a gratuitous finding of intentional misconduct. The trial court's decision that LGE breached its fiduciary duties in connection with the stock issuances was based entirely on Russell's business valuations, which the court found were not "fair market analyses." However, the court did not find Russell undervalued the Agency intentionally. Instead, later in the decision when explaining its reasons for awarding reformation, it stated that "Mr. Russell made mistakes in his accounting" and "erred in assigning different valuations for the company based on his flawed EBITDA analysis." These descriptions signal the court's view that the undervaluing of the stock prices resulted from negligent, not intentional, misconduct on the part of Russell.

Thus, although the trial court used the word "manipulation" in its ruling, the rest of its decision makes clear its resolution of the breach of fiduciary duties cause of action was not based on a finding that LGE committed intentional acts of misconduct.

2. *The Trial Court Did Not Err by Awarding Reformation*

Next, Defendants contend that because the trial court found the misconduct that constituted a breach of LGE's fiduciary duties was committed intentionally, the court erred by awarding reformation, which Defendants argue cannot be granted in a case involving "[a]nything more than ordinary negligence (such as gross negligence or intentional misconduct)." Since we have already determined the court did not, in fact, base its ruling on a finding of intentional misconduct, however, we reject this argument as well.

### 3. *The Trial Court's Factual Findings Were Not Internally Conflicting*

Next, Defendants claim the trial court's basis for awarding reformation conflicted with its ruling that the equitable claims were not time-barred.

The amended complaint sought reformation of the two stock issuance agreements based on the allegation they were intended to be based on the stock's fair market value, but in reality were based on stock valuations that were below market value. The stock issuance agreements were entered in evidence during the jury trial. Each agreement recited the number of additional shares of stock to be issued by the Agency in exchange for each party's capital contribution (or, in the case of LGE, forgiveness of the Agency's debt). Each agreement stipulated these recitals were "true and correct."

The part of the trial court's decision in which it gave its reasons for granting reformation began by quoting Civil Code sections 3399[13] and 3401.[14] The court then set forth its ruling on reformation as follows: "In this case, the parties intended that Plaintiff would suffer two reductions in his ownership interest in [the Agency], based upon a correct valuation of the company's worth. Plaintiff relied on [LGE] to accomplish this purpose. . . .

---

[13] Civil Code section 3399 provides: "When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value."

[14] Civil Code section 3401 provides: "In revising a written instrument, the Court may inquire what the instrument was intended to mean, and what were intended to be its legal consequences, and is not confined to the inquiry what the language of the instrument was intended to be."

LGE's employee, Mr. Russell[,] made *mistakes* in his accounting.  He erred in assigning different valuations for the company based on his flawed EBITDA analysis. . . .  Plaintiff recovers a fair, if diluted, ownership in [the agency], that is 17.53% ownership interest, for a total stock holding in the amount of 45,127 shares of stock in [the Agency]."  (Italics added.)

Defendants seize on the word "mistakes" in this passage and contend it signals the trial court awarded reformation based on Russell's unilateral mistake.  Next, they reason that under Civil Code section 3399, a unilateral mistake supporting reformation requires evidence—in Defendants' words— "the non-mistake making party 'knew or suspected' the mistake of the other party 'at the time.' "  (Boldface omitted.)  From this, they conclude the trial court implicitly found James was "the non-mistake making party," and that he therefore " 'knew or suspected' " at the time Russell performed the stock valuations that they were wrong.  (Boldface omitted.)  This leads Defendants to their conclusion that James's discovery of the relevant facts relating to the undervaluation of his stock was not delayed, despite the court's finding otherwise when it ruled the statute of limitations had not run.  Thus, Defendants argue, the court's decision was internally conflicting.

Defendants' logic falls apart at its first step, because their focus on the trial court's observation that Russell "made *mistakes in his accounting*" is misplaced.  (Italics added.)  The relevant mistake for purposes of the remedy of reformation is the parties' mistake in making the agreement.  "Reformation may be had for a mutual mistake or for the mistake of one party which the other knew or suspected, but in either situation the purpose of the remedy is to make the written contract truly express the intention of the parties."  (*Lemoge Electric v. County of San Mateo* (1956) 46 Cal.2d 659, 663; see Rest.2d Contracts, § 155 ["Where a writing that evidences or

54

embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties *as to the contents or effect of the writing*, the court may at the request of a party reform the writing to express the agreement[.]"  (Italics added.)].)

" 'Even though a finding might have been more clearly phrased, it is sufficient if its language is clear enough to indicate what the court intended.' "  (*Richter, supra*, 36 Cal.2d at p. 639.)  Russell did not sign the stock issuance agreements; he merely performed the underlying calculations and gave the results to other LGE personnel.  The accounting mistakes the trial court attributed to him were not mistakes as to the contents or effect of the stock issuance agreements.  (See Rest.2d Contracts, § 155.)

Though the trial court did not say so explicitly, it is nevertheless clear from the court's language that the relevant "mistake" that was the basis for its grant of reformation was the parties' mutual, but mistaken, belief (in the court's words, "the parties['] inten[t]") that the stock issuances were "based upon a correct valuation of the company's worth."  The court's discussion of Russell's mistakes in accounting, which were "based on . . . flawed EBITDA analysis," conveyed its finding that the business valuations used to calculate the number of shares of stock issued in each of the two transactions were not "correct" as the parties intended.  It is thus sufficiently clear from the court's discussion that its award of reformation was based on a finding of mutual mistake by "the parties."

Because the trial court's decision was not based on a finding of unilateral mistake, the premise of Defendants' argument fails, and we need not and do not address their remaining contentions, including their argument that the finding of unilateral mistake irreconcilably conflicted with the court's ruling denying their statute of limitations defense.

55

4. *The Decision to Grant Reformation Was Supported by Substantial Evidence*

Next, Defendants contend that this court "cannot affirm" the trial court's decision to grant reformation "under that theory [of mutual mistake]" because substantial evidence does not support this theory. We reject their claim.

" '[I]n reviewing the sufficiency of the evidence, we must consider all of the evidence in the light most favorable to the prevailing party, accept as true all the evidence and reasonable inferences therefrom that tend to establish the correctness of the trial court's findings and decision, and resolve every conflict in favor of the judgment.' " (*Garlock Sealing Techs., LLC v. NAK Sealing Techs. Corp.* (2007) 148 Cal.App.4th 937, 951 (*Garlock*).)

Defendants' first argument is somewhat convoluted, but essentially they contend there is a lack of substantial evidence the parties agreed to " 'a *correct* valuation of the company' " because the stock issuance agreements did not set forth any particular methods of valuation. We reject the argument because the court did not find the parties agreed to any particular valuation methods. The court only found the parties agreed the valuations themselves—i.e., the *result* produced by the method—would be correct. And although the parties dispute whether extrinsic evidence supported the court's finding of mutual intent, they ignore relevant language in the stock issuance agreements themselves. (See *Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 396 ["The mutual intention of the parties is to be inferred, if possible, solely from the written provisions of the contract."].) Specifically, the parties stipulated in each stock issuance agreement that the recitals, which specified, among other things, the number of shares to be issued in exchange for each capital contribution, were "correct." This explicit contractual term necessarily reflected the parties' understanding (*ibid.*), and

56

it served as substantial evidence supporting the court's finding of mutual intent.

Defendants' second argument is that Russell "was not mistaken in his actions," so the trial court erred in granting reformation. Their argument refers us to earlier sections of their brief in which they describe Russell's testimony defending his calculations. But Defendants ignore Burkholder's testimony criticizing Russell's EBIDTA analysis. And because Defendants' argument is entirely based on evidence favoring their position, it is not an adequate substantial evidence argument. "The appellant's brief must set forth *all* of the material evidence bearing on the issue, not merely the evidence favorable to the appellant, and must show how the evidence does not sustain the challenged finding. [Citations.] If the appellant fails to set forth all of the material evidence, its claim of insufficiency of the evidence is forfeited." (*Garlock*, *supra*, 148 Cal.App.4th at p. 951.) The court's finding that Russell's methods were erroneous was explicitly premised on Burkholder's testimony and opinions. This was substantial evidence supporting the court's decision.

Defendants' third argument is that because three experts (Russell, Burkholder, and Zamucen) all "testif[ied] to different valuation methods," this proves no " 'correct' valuation method" existed. However, the trial court concluded otherwise when it adopted Burkholder's analysis "as establishing the value of [the Agency]." Again, this finding was supported by substantial evidence.

5.    *Defendants Fail to Establish That the Court Committed*
      *Reversible Error in Resolving the Declaratory Relief Claim*

James's cause of action for declaratory relief against LGE sought judicial declarations of various rights and obligations of the parties under the Shareholders' Agreement as to which the parties were allegedly in dispute.

In its statement of decision, the trial court found the parties "now agree" as to the interpretation of the Shareholders' Agreement, and that "this issue is now moot."

Defendants quarrel with this reasoning and claim the "cause of action was not moot" but instead was abandoned by James "at some time after the trial commenced" and as a result James "did not meet his burden of proof that declaratory relief was appropriate." (Boldface omitted.) They argue the "ruling denying the motion for JNOV on this cause of action must be reversed."

Defendants do not demonstrate a basis for reversal. Mootness is a ground for denying declaratory relief. (See, e.g., *Burke v. City etc. of San Francisco* (1968) 258 Cal.App.2d 32, 34 [explaining that declaratory relief "will not lie to determine a matter which is or has become moot"]; accord *Teachers Management & Inv. Corp. v. City of Santa Cruz* (1976) 64 Cal.App.3d 438, 444 ["An action for declaratory relief will be dismissed if it is shown that the controversy presented is or has become moot."].) By ruling the issue moot, the court effectively declined to award declaratory relief. Although Defendants argue the court should have rejected the claim for a different reason, Defendants fail to identify an injury flowing from the court's alleged error. (See Code Civ. Proc., § 475 ["No judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed."].)

We decline to reverse the order denying Defendants' JNOV motion on this ground.

DISPOSITION

The judgment and orders are affirmed.  James is entitled to his costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

DO, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.